THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JOSEPH L. CROSSNO, JR., Defendant-Appellant.

Third District    No. 80-135

Opinion filed February 23, 1981.

Robert Agostinelli and Thomas A. Lilien, both of State Appellate Defender's Office, of Ottawa, for appellant.

Bruce W. Black, State's Attorney, of Pekin (John X. Breslin and Rita F. Kennedy, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. PRESIDING JUSTICE ALLOY delivered the opinion of the court:

The defendant appeals from convictions for three counts of murder and one count of aggravated battery. He was sentenced to 30 years' imprisonment for each of the three counts of murder and to 5 years' imprisonment for aggravated battery, the sentences to run concurrently. It is undisputed that all of these convictions arose from the same act. *People v. King* (1977), 66 Ill. 2d 551, 363 N.E.2d 838.

On August 12, 1979, at about 1:30 a.m., 26-year-old Blair Parnham went through a floor-to-ceiling plate glass window at the Nashville North Tavern in East Peoria. A triangular piece of glass, several inches in length, penetrated his left neck-shoulder region from above, severing his carotid artery, bronchus, pulmonary artery, and aorta, and penetrating his lung and heart, causing him to bleed to death. An examining physician for the coroner's office testified that death probably occurred within 10 seconds of the injury.

The defendant, 34-year-old Joseph Crossno, Jr., was charged with throwing Parnham into a window with sufficient force to break the glass and propel Parnham partially through the window, thereby causing a piece of glass to penetrate his body and cause his death. The indictment charged in count I that Crossno committed this act with intent to do great bodily harm to Blair Parnham. (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(a)(1).) Count II charged that defendant committed the same act knowing such

act created a strong probability of death or great bodily harm. (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(a)(2).) Count III charged the defendant with felony murder (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(a)(3)), the felony being aggravated battery. Count IV charged the defendant with aggravated battery, in that in committing the same act, he knowingly caused great bodily harm to Blair Parnham. Ill. Rev. Stat. 1979, ch. 38, par. 12—4(a).

The prosecution, in its case in chief, presented three occurrence witnesses. Ann Lowery was the only State's witness claiming to have seen the defendant approach Blair Parnham just prior to the latter's death. The defendant was employed as a bouncer at the Nashville North. Mrs. Lowery testified that she observed Blair Parnham leaning against a rail in front of the third window from the door of the tavern. A police technician testified that this rail ran parallel to the plate glass windows. It was 2 feet 10 inches high, three or four inches wide, and was located 10 or 11 inches from the windows. Mrs. Lowery testified that she then saw Blair Parnham leave a bottle of beer on the ledge of the rail and walk toward the bathroom. He soon returned, walking rather fast. She did not notice him limp. She testified that the defendant followed Parnham to the windows. Her testimony is unclear as to when the defendant approached Parnham. She testified that Parnham had returned to the window and was leaning against the rail with his head down as if he were asleep. He held a beer bottle in his left hand. She stated that the defendant arrived at this location about a minute later. At another point in her testimony, she indicated that the defendant followed Parnham across the room. She testified that the defendant pushed Parnham backward. She did not know if Parnham's head struck the window, but she saw a sheer curtain on the inside of the window move. She testified that the defendant pushed Parnham again, and that this time the window broke. Glass showered down and struck Parnham. Parnham began bleeding, with blood spurting from his neck "like a garden hose". She stated that the defendant had hold of Parnham's lapels and pulled him forward out of the window. Mrs. Lowery testified that defendant then shook Parnham in a back and forth motion toward the window.

Mrs. Lowery then testified that the defendant threw Parnham to the ground. She testified both that Parnham dropped straight down and that Parnham landed in front of the second window from the door (the window east of the broken one). She also testified that the defendant then "acted like he was going to try to hit [Parnham] or kick him." Defense counsel failed to object to this conclusory statement. The witness stated no observations or other facts as a foundation for this conclusion. Mrs. Lowery testified that Parnham then wound up in front of the easternmost window, the one closest to the door. She does not know if he was dragged,

if he crawled, or if he staggered to this location. She testified that, at this point, John Hauck, the manager, and Dave Shoulders, the assistant manager of Nashville North, had to "physically pull [the defendant] off" of Parnham. She stated that this was because the defendant still had a hold on Parnham, but later acknowledged that she did not actually see the defendant continue to hold Parnham, but only saw the defendant leaning over Parnham.

On redirect examination, the prosecutor asked Mrs. Lowery if, when she saw the defendant throw Blair Parnham to the floor, the defendant appeared angry. No objection was made to this question, and the witness answered, "Yes, he was very angry." No foundation in observation was laid for this conclusion, and no objection was made. On re-cross-examination, Mrs. Lowery again stated that the defendant was angry. She could not hear what he was saying because loud music was playing at the time. She saw that his face was red. The defendant's back was to her, but she testified that she could see his face at an angle. She testified that the defendant pointed his finger near Parnham's face prior to pushing him. Mrs. Lowery testified that she had consumed no alcohol that evening. She testified that she did not know Blair Parnham and only knew the defendant as "Joe the bouncer." She testified that she focused her full attention on the incident because she knew Joe Crossno was the bouncer and "I figured there was trouble because Joe came around."

The State's second occurrence witness was Paul King, a former Illinois State trooper. He was seated at the bar of the Nashville North with his back to the windows. Upon hearing glass falling from the broken window, he turned around and saw the defendant and Blair Parnham "involved in an altercation." He stated "Joe had Parnham by the front of the shirt and he was, looked, it appeared to be shoving him back and forth and the glass was falling all the time." Parnham then "wound up lying on the floor." "And he got up and walked over to where I was sitting. And he fell on the floor right by me. And he laid there." From this time forward, the prosecutor, in questioning the witness, referred to the incident as "the Defendant shoving Blair Parnham back and forth through the window." The witness did not hear the defendant and Parnham exchange words. At the time of the incident, the defendant's back was toward Mr. King. The defendant's right shoulder and Blair Parnham's left shoulder were turned toward the glass. Paul King could not see the defendant's right hand, but saw the defendant's left hand clutching Blair Parnham's lapel. On cross-examination, the witness stated that the defendant "shoved [Parnham] into the glass, I don't know, two or three times, I don't know exactly how many times * * *." Mr. King did not know if Parnham fell to the floor or was shoved down by the defendant. He testified that there were a lot of people standing around Blair Parnham when he fell again near the door.

He also acknowledged that his view of the area of the broken window was blocked just after the glass started falling because people started running to that part of the room. He did not see anyone pull the defendant from Parnham, nor did he see the defendant walk away without being pulled off.

The State's third and final occurrence witness was Kathy Osborne, a waitress at Nashville North. At the time of the incident, she was standing at the waitress station, some 23 feet from the windows. Two rows of the horseshoe-shaped bar and a work area, containing shelves of liquor bottles and bar equipment, stood between her and the south windows. She testified that she was waiting for the bartender to fill her drink order when her attention was directed toward the south windows by the sound of breaking glass. She looked up and saw "Joe Crossno shoving the guy into the window * * *." The prosecutor, from this moment, in questioning this witness, consistently characterized the actions of defendant as "pushing [Parnham] back and forth into the window". The leading nature of this questioning was never objected to by defense counsel. In response to the question, "About how many times did you see Joe push this man back and forth into the window?" Mrs. Osborne answered, "I'm not sure, but it was a few." She testified that after the pushing, she saw the defendant pull Parnham back through the window. She testified that when she saw the incident, she remarked to another waitress, "Why doesn't he quit putting him, you know, pushing him into it?" Mrs. Osborne testified that she had not seen Blair Parnham causing any trouble in the tavern that evening. On cross-examination, it was brought out that the barroom was dimly lit and that the witness observed the incident while looking past shelves and work surfaces covered with liquor bottles, a cash register, popcorn machines and other barroom equipment. She testified, however, that although some liquor bottles were in her way, they did not obstruct her view of the incident. She testified that she and Joe Crossno "have had some differences" but that "we had it all straightened out a long time ago."

A motion for directed verdict of acquittal at the close of the State's case was denied.

The defense presented nine occurrence witnesses. James Henzler was seated on the side of the bar opposite from the windows, near the waitress station at the time of the incident. He testified that when he stood, he could see over the liquor bottles in the center of the horseshoe-shaped bar, and could observe people's heads in the area near the window. He is six feet tall. He did not see the incident, but when he heard the glass break, he walked around the corner of the bar and saw Parnham walking and bleeding. He testified that he and Dave Shoulders made Parnham lie down and attempted to administer first aid. His wife,

Delores, was standing next to her husband when the glass broke. She testified that she could not see the window area because people were standing between the other side of the bar and the windows. She was standing closer to the waitress station than was her husband.

Gregg Ozment testified that he was sitting on the side of the bar closest to the windows and saw the incident over his shoulder. He testified that Parnham had bumped him near the restroom and that he, Ozment, had elbowed and threatened Parnham as a result. He later saw Parnham return to the window area. Parnham then approached the bar, ordered another drink, and returned to the window with a beer bottle. Ozment did not notice Parnham limp. He then saw the defendant approach Parnham and engage him in conversation. He could not hear what was said. Parnham moved his arms about and the witness speculated that Parnham was asking to be left alone because he had not done anything. The defendant moved his elbows in imitation of the way Parnham had been bumping people. Parnham made a sudden, jerking move and Crossno shoved him backward toward the window. The defendant had one hand on Parnham's shirt and another against a post, presumably the post between two of the window plates. The witness could not tell whether the defendant first grabbed Parnham's shirt and then shoved him, or first shoved him and then grabbed his shirt. He speculated that the defendant was trying to pull Parnham back into the room after Parnham had gone through the window. He testified that he saw the fatal piece of glass fall from the upper corner of the window. He testified that Parnham had gone into the window only one time.

Charles Burton testified that he stood at the end of the horseshoe, between the two sides of the bar. He observed Blair Parnham swing his arms as he walked and bump into people at the tavern. He did not observe him limp. He saw Parnham bump into the door girl and heard Billy Ray Dickerson complain to the defendant, "Someone's going to have to do something about him; he's running into a lot of people." The defendant was filling the ice cooler at the time. Parnham had already reached the windows when the defendant followed him. The next thing the witness noticed was the sound of breaking glass. He looked up and saw the defendant say, "You're going to have to leave." Bill Dickerson then said, "No, he's hurt too bad, he can't leave." Parnham took 10 steps and collapsed. Mr. Burton's wife, Tina, also testified that she heard glass break and saw the defendant pull Parnham from the window. She testified that the defendant was her husband's and her friend, but that they only saw the defendant at the tavern. Mr. Burton testified that the defendant had once bought a used car from Burton and Billy Dickerson. They are car salesmen at the same establishment.

Billy Ray Dickerson next testified. He has also been employed as a

bouncer. He testified that Blair Parnham had walked repeatedly around the barroom, deliberately bumping into people. He testified that a bouncer, when confronted with such a situation, should get the person to leave before he precipitates a fight. At the time of the incident, Mr. Dickerson was standing at the curve of the bar, near the front door. He heard the glass break and saw the defendant pull Parnham from the window. Mr. Dickerson's testimony as to his own statements and that of the defendant correspond to the testimony of Mr. Burton. Dickerson also testified that Parnham did not fall near the window, but staggered to the door and then fell. He testified that immediately after the breaking of the glass, the two managers, John Hauk and Dave Shoulders, told the defendant to go to the office and the defendant did so. Dickerson thought that, after the glass broke, the defendant was in a state of shock. Dickerson's testimony as to a comment made by the female doorkeeper, concerning Parnham's bumping people, was refuted by the young woman's rebuttal testimony. Dickerson acknowledged on cross-examination that he had consumed 20 whiskey and cokes on the evening in question.

Ann Hall testified that she stood near the wall at the curve of the bar. She had known the defendant two years. She did not see the defendant until after the incident, when he was bandaging his cut thumb.

Dave Shoulders testified that his attention was called to the scene of the incident by the sound of breaking glass. The defendant had hold of Parnham from the front, and both of them were leaning into the broken window. "Joe pulled him out of the glass and the guy came straight down to where I was [near the door] and fell into the other window and I caught him and laid him down on the ground or the floor." Mr. Shoulders was employed by the Nashville North as an assistant manager. He was the supervisor of the bouncers. Shoulders acknowledged that on the morning of August 12, he told Detective Charles Morgan that he saw Crossno grab Parnham by the front of the shirt with his right hand and shove him over a railing into the plate glass window. He stated at trial, however, that he had not seen the actual incident until after the glass had broken, and had based his statement on his observation of the defendant holding the front of Parnham's shirt after the window had been broken. They looked like they were both stuck in the window and could not get out. The witness stated that he later tried to explain this to the detective.

All of the aforementioned witnesses had been excluded from the courtroom prior to their testimony.

Joseph Crossno testified in his own defense. He testified that he was a carpenter by trade, but that business was slow and he had taken a job as a bouncer in order to support his wife and three children. He stated that he had consumed approximately six drinks on the evening of the incident. He testified that he had observed Blair Parnham bumping into groups of

people. He told Parnham to sit down and Parnham responded politely, "Whatever you say." Later, as he was filling the ice cooler, he again noticed Parnham walking with a swaying motion. Parnham walked through, rather than around, a group of people, and some people made sarcastic remarks. The defendant decided he would ask Parnham to leave. However, he lost sight of Parnham and thought no more about it. Soon thereafter, Billy Ray Dickerson and others complained about a man bumping into them. The defendant did not immediately recognize that the man was Parnham. When he did, he walked over to confront him. He told Parnham he would have to leave because people were complaining that he had shoved them. The defendant testified that he gestured with his elbows to explain to Parnham the behavior that the other patrons found annoying. Parnham stood up and appeared agitated. He asked the defendant why he was moving his elbows about. Parnham also said that he was not going to leave. Words were exchanged. The defendant did not recall just what was said. Parnham was holding a beer bottle, first with both hands, and then with his left hand. Parnham suddenly jerked and the defendant saw the beer bottle being raised. He said he feared that Parnham intended to strike him, and he hit Parnham on the left cheek. Parnham went into the window and the defendant heard and saw the window crack and bow. He then grabbed Parnham's shirt and spun toward his right. As he was pulling Parnham from the window, the defendant's own right shoulder struck the glass, breaking it. The defendant pulled Parnham back and then stepped back himself four or five feet. He at first noticed only a cut on Parnham's face. Then he saw three great spurts of blood from Parnham's neck. "It was just so unreal * * * I couldn't believe it." Then John Hauk came up and said, "What the hell has happened?" and told the defendant to go to the office. Parnham did not fall, but turned to his left and took a few steps toward the door. The defendant suffered a cut on his thumb. He testified that he had never seen Parnham before that night. Both the defendant and Parnham were taken to Saint Francis Hospital for treatment. "I watched them working on him * * * trying to save his life. I couldn't believe what had happened * * * they had left the door open and I prayed for him because I couldn't believe what had happened." "I had nothing against the boy. I had no former opinion of him. It wasn't unusual * * * to call somebody down for being a little rowdy—it's typical * * *." On cross-examination, the defendant testified that Parnham had attempted to hit him with a bottle, and that the bottle had grazed his shoulder. On cross-examination, the defendant summarized the actual incident as follows:

"He had went back like that and I at the same instant—just in a fast repetition or whatever—I went into him to get him, to retrieve him from it and I spun in a spiral fashion being that division strip would

have been the closest way to get him away from that. I got him into that and that same instant I almost went out the window myself. At that time I came out like that and that's when I brought Mr. Parnham away from the window."

The defendant testified that after he pulled Parnham from the window he was afraid of Parnham. He earlier had thought that Parnham was "squaring off" against him, but later realized that Parnham was badly hurt and was merely reaching for his own throat. It was brought out that, in his testimony to the grand jury, the defendant had indicated more belligerent behavior on the part of Parnham. The defendant explained that he was on medication at the time he testified before the grand jury and could not recall his statements to them.

It was established by the prosecution early in its case that Blair Parnham had suffered permanent injury in a motorcycle accident several years before his death. The middle finger of his right hand was fused and could not bend. His right knee had been injured in such a way that his right leg was shorter than his left. He did not limp, but compensated for his leg injury by adopting an exaggerated "strut" when he walked.

During the cross-examination of the defendant, the prosecutor asked, "Did anyone ask you why you had done this to Mr. Parnham or words to that effect." The defendant answered, "No." The prosecutor asked, "Did you threaten anyone else after this happened to Mr. Parnham?" Answer, "No, sir." The prosecutor then asked, "Specifically, did you tell anybody to shut up or they would get the same thing Mr. Parnham did?" The defendant answered, "No, sir." None of these questions was objected to as being beyond the scope of direct examination. In rebuttal, the prosecution called as a witness Rick Seaman, who testified that he was seated at the bar on the night of the incident. He heard a woman scream and when he turned, he saw the defendant "in a slunched-over position." "I told him he had no business doing that and he told me that if I didn't shut up I would get the same thing." He said no one else was involved in the conversation. On cross-examination it was brought out that this witness had made the following statement at the East Peoria police station:

"Well, I was just standing there at the bar at Nashville North and the guy who was pushed into the window had went to the restroom or elsewhere or wherever he went and when he returned I noticed him returning. I just stood by the bar and the next thing you know a man came up to him and was arguing and having a discussion with him and the next thing you know he was pushing him through the window. That's all that took place and when it took place I said to the three people that were around including the singer [Dave Shoulders] that he had no business doing so because the guy did nothing as far as I was concerned. I was standing in front of him at

the bar which he was standing behind the window and he told me that if I didn't shut up I would get the same thing." [Police] question: "Who told you this?" Answer: "The three guys including the singer and whoever did this to the guy who pushed him through the window. Another man, the singer told me this."

Four days later, on August 16, the police interviewed Mr. Seaman to find out just who had threatened him. He said the defendant was the one who uttered the threat and that the others (later identified as Dave Shoulders and John Hauk) assented. At trial, Seaman said that only the defendant threatened him, that Dave Shoulders stood 5 to 10 feet away, and that he could not hear Shoulders or Hauk because of the noise of the crowd. At trial, Seaman also said that he had his back to the scene of the incident and did not turn around until alerted by the woman's scream. He first saw the defendant bent over toward the floor and did not see Parnham fall.

Prior to the testimony of Mr. Seaman, defense counsel, anticipating the main content of Seaman's testimony, asked that he not be allowed to testify, because the prejudicial effect of his testimony would outweigh its value to the prosecution in impeaching the defendant. The motion was denied. The objection, however, was preserved, and the jury was instructed to consider the testimony only for purposes of impeachment.

No issue is raised in this appeal concerning the effectiveness of counsel. A post-trial motion has been made arguing that counsel was ineffective. Issues such as failure to investigate the State's witnesses are raised therein. The Defender Project thought that the record, as developed at the time of this appeal, failed to establish ineffectiveness of counsel, and the issue is, therefore, not now before us.

The defendant's first contention on appeal is that he was not proven guilty beyond a reasonable doubt. Specifically, he asserts that the evidence of the State's occurrence witnesses does not correspond to the physical evidence. Blair Parnham suffered two injuries, a cut to his jaw and the fatal wound to his neck. It is possible that the same piece of glass caused both injuries. The defendant suffered a deep cut on his left thumb. This also may have been produced by the fatal piece of glass. The defendant maintains that these few, albeit severe, injuries were inconsistent with the State's theory that the defendant raked Mr. Parnham back and forth through the glass. He argued that, had most of the glass remained in the window, the raking of a human being back and forth through the window would have resulted in multiple wounds. However, the testimony supports the conclusion that most of the glass was pushed out when first broken. The defendant's own witness testified that the fatal piece of glass fell from high up in the window. Therefore, even if Mr. Parnham had been pushed back and forth through the window he might not have come into contact with any glass after the initial impact, except for

the glass which, as the witnesses testified, rained down from above. There was no clear variance between the testimony and the physical evidence such as would require reversal.

It is clear from the testimony that this was factually a very close case. Many of the witnesses, on both sides, suffered from gaps in their observation and some, apparently, attempted to compensate for these with surmise. Leading questions were asked and answered on direct, and conclusory statements were admitted into evidence. Nevertheless, it was the province of the jury to evaluate the testimony. A court of review may not substitute its determination as to the evidence for that of the jury, unless the jury's determination is palpably contrary to the weight of the evidence or so unsatisfactory as to cause a reasonable doubt of guilt. *People v. Perroni* (1958), 14 Ill. 2d 581, 593, 153 N.E.2d 578; *People v. Burnett* (1979), 74 Ill. App. 3d 990, 1000, 394 N.E.2d 456.

■■ The fourteenth amendment of the United States Constitution requires that conviction be based upon proof beyond a reasonable doubt. (*In re Winship* (1970), 397 U.S. 358, 361, 25 L. Ed. 2d 368, 90 S. Ct. 1068.)

> "After *Winship* the critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be not simply to determine whether the jury was properly instructed, but to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. But this inquiry does not require a court to 'ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.' *Woodby v. INS*, 385 U.S., at 282. Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See *Johnson v. Louisiana*, 406 U.S., at 362. This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution. The criterion thus impinges upon 'jury' discretion only to the extent necessary to guarantee the fundamental protection of due process of law." (*Jackson v. Virginia* (1979), 443 U.S. 307, 318-19, 61 L. Ed. 2d 560, 99 S. Ct. 2781.)

Under this standard, the verdicts in this cause will not be overturned on the record for insufficiency of proof.

■■ Because the standard set forth above is dictated by the United States

Constitution, a defendant must be afforded at least such protection on review of his conviction. The States, of course, may go further to protect the right of defendants to conviction only upon proof beyond a reasonable doubt. Reiterating the holdings of a long line of Illinois cases, this court recently stated:

"Unless the evidence is so palpably contrary to the verdict or so unsatisfactory as to raise a reasonable doubt of a defendant's guilt, a reviewing court will not set aside a jury's verdict, for any inconsistencies or discrepancies in the testimony of the witnesses, any possible bias or interest affecting the credibility of the witnesses, and the weight to be attributed to the testimony of the witnesses are matters peculiarly within the province of the jury. This is so because the jury is in a better position to assess each witness' ability to remember and opportunity to observe, weighing any discrepancy in light of all the evidence." (*People v. Seiber* (1979), 76 Ill. App. 3d 9, 12-13, 394 N.E.2d 1044.)

That a jury determination may be reversed by a court of review when "the evidence is * * * so unsatisfactory as to raise a reasonable doubt of defendant's guilt * * *" does not mean that a court of review has unbridled discretion to substitute its judgment for that of the jury. Such a substitution would debase the jury's function in our system of justice. The verdicts here were supported by competent evidence. They were not palpably contradictory to the evidence. We, therefore, decline to rule that these verdicts were based upon insufficient proof.

The defendant next raises several points of error in the prosecution's closing statements.

■■■ In his rebuttal closing argument, the prosecuting attorney stated:

"You can either believe the Defendant or you believe Ann Lowery, Paul King, Kathy Osborne, and Ricky Seaman. If you believe the Defendant you've got to find him not guilty of everything. If you believe the other witnesses you've got to find him guilty of murder and aggravated battery."

It is undisputed that a voluntary act of the defendant was the cause of the fatal injury to Blair Parnham. In issue, basically, was the defendant's state of mind. For the prosecutor to inform the jurors that, if they believe Ann Lowery, Paul King, Kathy Osborne, and Ricky Seaman, they must find the defendant guilty, is a misstatement of the law. "It is well established that a prosecutor's misstatements of law in closing argument can be grounds for reversal. See *United States v. Bohle* (7th Cir. 1971), 445 F.2d 54; *United States v. Phillips* (7th Cir. 1975), 527 F.2d 1021. Included within this restriction are statements that in effect distort the burden of proof by suggesting incorrectly what the jury must find in order to reach a certain verdict." (*United States v. Vargas* (7th Cir. 1978), 583 F.2d 380, 386. See

also *People v. Cole* (1980), 80 Ill. App. 3d 1105, 1108, 400 N.E.2d 931; *United States v. Phillips* (7th Cir. 1975), 527 F.2d 1021.) In the *Cole, Vargas,* and *Phillips* cases, the prosecutors erroneously informed the respective juries that, in order to acquit the defendants, they had to find that the prosecution witnesses were lying. We see no logical difference between such statements and one, as in this case, that informs the jurors that, if they believe the prosecution witnesses, they must convict the defendant. "So presented, the correct standard for jury consideration of evidence in a criminal case was obscured. The test is, of course, not which side is more believable, but whether, taking all of the evidence in the case into consideration, guilt as to every essential element of the charge has been proven beyond a reasonable doubt." (*United States v. Stanfield* (9th Cir. 1975), 521 F.2d 1122, 1125.) "A review of the testimony of all the witnesses clearly establishes that the jury could fully believe the testimony of some, if not all, of the State's witnesses and still find the defendant not guilty." (*People v. Cole* (1980), 80 Ill. App. 3d 1105, 1108, 400 N.E.2d 931.) More was involved than the credibility of the State's witnesses, and the prosecutor misstated the law when he said that a finding by the jury that the stories of those witnesses were sincere necessitated verdicts of guilt as to murder and aggravated battery.

■■ Furthermore, it was a clear misstatement of the law for the prosecutor to state that the defendant's guilt was established by a jury finding that Ricky Seaman was a truthful witness. Ricky Seaman's testimony was offered solely to impeach defendant's testimony that he had not threatened anyone subsequent to the incident. The court informed the jury that it was only to be considered for purposes of impeachment. For the prosecutor to suggest that a jury finding that Ricky Seaman's statement was truthful necessitated a finding of guilt was tantamount to stating that Ricky Seaman's testimony tended to establish the single issue in question, defendant's state of mind. As the court had already ruled that Ricky Seaman's testimony was only to be used for impeachment, and was to have no substantive use in this cause, the prosecutor's reference to his testimony in this fashion was plain error. The prosecutor also asked the jury to imagine itself "above Nashville North. We couldn't see, but we could hear. What would we hear in the ordinary sounds of a bar? Glasses tinkling, people talking, music. Then what do we hear? We hear the sound of glass breaking. 'Leave him alone; he's not bothering anybody.' 'Why doesn't he quit?' *'Hey, you had no reason to do that to him.' 'Shut up or you'll get some of the same.'* 'What the Hell are you doing?' " The clear import of this "reconstruction" was to demonstrate that defendant had the requisite state of mind to commit murder and aggravated battery. The inclusion in this scenario of statements to which only Ricky Seaman testified (emphasized above) was clearly for the purpose of establishing

state of mind and not for the sole purpose of impeachment for which the testimony was admitted.

■■ ■ The prosecution also had a tendency to lump together, at other points in its argument, the testimony of Ann Lowery, Paul King, Kathy Osborne, and Ricky Seaman. While this technique is justifiable, as the State argues, where joint reference to the witnesses serves only to contrast their credibility with that of the defendant, it is improper where, as here, joint reference to the impeachment and occurrence witnesses is strongly suggestive to the jury that the impeachment testimony is, in itself, probative of an element of the offense. Where testimony is admitted only for the purpose of discrediting an accused's testimony, it is improper for the prosecution to refer to it for any other purpose. *People v. Hoggs* (1974), 17 Ill. App. 3d 67, 71, 307 N.E.2d 800.

■■ The defendant further argues that the prosecutor vouched personally for the credibility of the State's witnesses when he said: "I submit to you, ladies and gentlemen, that the people who should be believed in this case are Ann Lowery, Paul King, Kathy Osborne, and Ricky Seaman. And the person to be disbelieved is the defendant * * *. Mr. Crossno told you * * *' I have only told you the truth,' and we know that is not accurate." A prosecutor may not express his personal opinion of the credibility of the witnesses (*People v. Valdery* (1978), 65 Ill. App. 3d 375, 378, 381 N.E.2d 1217), but may suggest to the jury that the evidence shows some testimony to be credible, other testimony incredible. (*People v. Daniels* (1979), 76 Ill. App. 3d 646, 652, 395 N.E.2d 163; *People v. Owens* (1977), 46 Ill. App. 3d 978, 994-95, 361 N.E.2d 644.) It has been held that the words "I submit to you * * *" do not constitute an expression of personal opinion by the prosecutor, but properly suggest to the jury the inferences they may draw from the evidence. (*People v. Franklin* (1978), 64 Ill. App. 3d 400, 404, 380 N.E.2d 1082; *People v. Anthony* (1976), 41 Ill. App. 3d 1025, 1030-31, 355 N.E.2d 218.) It is, therefore, clear that the prosecutor did not personally vouch for the credibility of the State's witnesses in the instant case.

■■ In his rebuttal closing argument, the prosecuting attorney stated, "If you want to slap him on the wrist find him guilty of involuntary manslaughter." Here we have a case in which both the prosecution and the defense were arguing against conviction for the included offense of involuntary manslaughter. The jury found the defendant not guilty of involuntary manslaughter. It is elemental that counsel may not inform the jury of the severity of the sentence to which the accused is subject. Sentencing, except for certain capital cases, is exclusively the province of the judge. The court had, by the time of closing arguments, ruled that an instruction on involuntary manslaughter would be read. The prosecutor's reference to the severity of the sentence for involuntary manslaughter was

not merely informing the jury, but was misinforming it. Defense counsel would not have been permitted to have countered with a statement that, contrary to the prosecutor's assertion, involuntary manslaughter is a serious crime, punishable by two to five years' imprisonment in a penitentiary (Ill. Rev. Stat. 1979, ch. 38, pars. 9—3(b)(1), 1005—8—1(a)(6)). In this trial, the "door was opened" to a certain extent, because defense counsel, in his closing remarks, had referred to the penalty for murder applicable in this case, 20 to 40 years' imprisonment. This was not objected to, but was, in fact, repeated in the prosecution's rebuttal argument. However, this does not excuse misinforming the jury as to the severity of the punishment for involuntary manslaughter on rebuttal, when it cannot be challenged by the defense, except by way of an interjected objection.

■■ The prosecutor, also in his rebuttal argument, referred to the defendant as "judge, jury, and executioner" of Blair Parnham. The defendant was not indicted for murder with intent to kill. The prosecutor himself explained that the State was not claiming that the defendant intended to kill Blair Parnham. The reference to defendant as "judge, jury, and executioner" was unsupported by the evidence and was improper.

■■ While a prosecutor may dwell upon the evil of crime and exhort the jury to fearlessly administer the law (*People v. Hairston* (1970), 46 Ill. 2d 348, 375, 263 N.E.2d 840), he should refrain from making inflammatory appeals to the fears of the jury. (*People v. Lurry* (1979), 77 Ill. App. 3d 108, 114, 395 N.E.2d 1234; *People v. Blackman* (1976), 44 Ill. App. 3d 137, 140, 358 N.E.2d 50.) The prosecutor remarked, "Tomorrow, it may be your son or my son." This contributed nothing to the clarification of issues before the jury and had an inflammatory effect. (See *People v. Harris* (1975), 33 Ill. App. 3d 600, 605, 338 N.E.2d 129.) In the instant case, the remark was, to a certain extent invited by an appeal to sympathy in the defense counsel's closing argument. (*People v. Matthews* (1979), 69 Ill. App. 3d 65, 67, 387 N.E.2d 10.) While, therefore, not rising to the level of reversible error at the instant trial, such remarks should be avoided.

■■ ■ It is conceded by the defendant that none of the prosecutor's remarks was objected to at trial, nor were contentions of error regarding them included in post-trial motions. "In criminal cases in which the evidence is closely balanced, [our Supreme Court] has held that [we] may consider errors that have not been properly preserved for review." (*People v. Pickett* (1973), 54 Ill. 2d 280, 283, 296 N.E.2d 856.) In a case such as this, where the evidence of guilt was conflicting, the statements by the prosecutor which we have found to constitute error "affected substantial rights of the defendant and consequently they are considered in this appeal under the 'plain error' doctrine." (*People v. Lurry* (1979), 77 Ill. App. 3d 108, 114, 395 N.E.2d 1234; Supreme Court Rule 615(a) (Ill.

Rev. Stat. 1979, ch. 110A, par. 615(a)).) For the same reason, these errors cannot be ruled harmless on the record.

For the reasons stated herein, the judgments of the Circuit Court of Tazewell County are reversed and the cause is remanded for retrial.

Reversed and remanded.

SCOTT and BARRY, JJ., concur.