THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
TYRONE BOCLAIR *et al.*, Defendants-Appellants.

First District (4th Division)    No. 80-1905

Opinion filed April 29, 1982.—Rehearing denied May 20, 1982.

Ralph Ruebner, Steven Clark, and Phillip Zisook, all of State Appellate Defender's Office, of Chicago, for appellants.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Michele A. Grimaldi, and Bruce A. Cardello, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE JOHNSON delivered the opinion of the court:

After a jury trial, three of the defendants, Tyrone Boclair, Jessie Scott, and Johnny Ollie, were found guilty of unlawful restraint, armed

robbery, and armed violence (Ill. Rev. Stat. 1977, ch. 38, pars. 10—3(a), 18—2, 33A—2). Defendant Frederick Chism waived a jury trial and the court found him guilty of the above charges. All defendants were tried simultaneously. Following a hearing in aggravation and mitigation, each defendant received a 7-year sentence for armed robbery and a 3-year sentence for unlawful restraint. No sentence was imposed on their convictions for armed violence.

On appeal, the following issues are raised for review: (1) whether defendants received a fair trial when other crimes evidence was introduced by the State and admitted into evidence by the trial court; (2) whether defendants received a fair trial when the prosecutor made an improper closing argument; (3) whether the trial court erred by sentencing defendants for armed robbery and unlawful restraint when both charges arose from a single act; and (4) whether the trial court erred by applying an unconstitutional statute which imposed a $500 fine on defendant Scott to be collected from his bond.

We affirm.

The following testimony was adduced at trial. The State's first witness, James E. Harris, testified that at about 1:15 a.m., on August 20, 1979, he left the Turning Point Lounge, located at 60th and State Street, in Chicago, to go to his home 1 block away. A factory with a fenced-in lot is located between his home and the tavern. As he approached the fence, Harris was grabbed by his neck and armpits, pushed into the lot and thrown backwards onto the sidewalk. When he looked up, he saw four people standing over him. One of them held a butcher knife to his stomach. While he was held down, the men took his hat, ring, watch, and wallet with his identification, and his money clip containing five $1 bills. The men walked slowly through the gate and proceeded to 60th Street.

While Harris was on the ground, James Burton, a neighbor, came to help him. Harris went home and told his wife that he had been robbed and beaten. He and his wife went to 60th and State where they saw three of the robbers with the police. The police found the fourth person hiding nearby in the weeds. The police gave Harris his wallet back that night.

On cross-examination, Harris stated that he had been in the lounge for 2½ hours. During that period, he consumed about three shots of gin mixed with tonic. Harris indicated that he was not under the influence of alcohol. He did not know which of the four men had grabbed him nor could he say which of them took his property nor which man held the knife.

Defense counsel asked Harris whether he remembered testifying at the preliminary hearing that the attack occurred at 12:45 a.m. He did not remember stating that exact time. The knife was held on him 2 or 3

minutes. He was certain that People's exhibit No. 1 was in fact the actual knife.

Harris' left elbow was injured during the robbery. He wore a cast for 2½ months. Harris wore eyeglasses at the time of his testimony; he was not wearing them on the night in question. He stated the glasses are for reading purposes. That night, August 20, the lighting conditions were good and the vacant lot contained two floodlights.

Harris thought defendant Ollie held the knife to his stomach but he was not certain. He was unable to describe the clothing worn by any of the four men. (He did not view a lineup.) Defense counsel for Scott referred to the preliminary hearing at which Harris stated he saw four men when he "got up." Harris did not recall making that statement and said that he saw the four men while he was on the ground. Defense counsel for Ollie read a question and answer from the preliminary hearing transcript in which Harris stated he was under a streetlight when he saw the four men. Harris stated he did not recall making the statement but said that a streetlight was in front of the area where he was robbed.

Harris stated he did not previously testify that anyone had a gun; he did not see a gun. Again, defense counsel read a question and answer from the preliminary hearing transcript in which Harris stated, "They had a butcher knife and they had a toy gun." Harris did not recall making this statement nor did he recall stating that one man had a toy gun.

Harris testified that he was not cut with a knife. He did not recall testimony at the preliminary hearing in which he stated that the person with the knife cut him. Defense counsel asked Harris to look at Ollie. The witness stated that Ollie was one of the four men but he did not know how he participated in the incident. There were two men holding him down from behind his head while two others (one on each side of him) were taking his property.

Defense counsel for Chism cross-examined Harris outside the presence of the jury. The person who held the knife held it by the handle. Harris only saw the blade of the knife at the time of the robbery. During the robbery, defendants did not talk except to say, "Let's cut him" and "We got enough. Let's go." He did not know which of the defendants took his property.

Robert Stevens, a Chicago police officer, testified that on August 20, 1979, he and his partner, Richard Gordon, were dressed in shabby, civilian clothes and riding in an unmarked police car. They were in the vicinity of 60th and State Street when a man ran into the intersection, waving his hands and yelling. The man approached the car. After the officers spoke with the man, Stevens drove west on 60th Street. He was looking for a group of black males. He noticed such a group about

midway down the block. As he approached the men, they began running. He drove the car past the men to block their path. He left the car, drew his service revolver, and told the men to halt and that he was a police officer. The three men immediately stopped.

Officer Stevens conducted a protective search of the men. He recovered a rusty knife with a 10- to 12-inch blade and a brown wooden handle. He identified Ollie, Chism, and Boclair as the men he searched. Other police officers arrived. Mr. and Mrs. Harris and Burton, their neighbor, also arrived. Harris and Burton identified the three men but said that one of the offenders was missing.

Officer Gordon proceeded in an easterly direction to search for the fourth man. He found defendant Scott in a weed-covered parkway between the curb and the sidewalk. A thorough search of the four men was conducted. Defendant Ollie had a knife in his possession, a crushable tan hat, a "yellow" metal Bulova watch and another Bulova watch. In defendant Scott's possession was a "white" metal Seiko watch, a billfold containing five $1 bills, and a wallet containing food stamps. Officer Stevens thought there was another item taken from Scott, but he could not remember what it was. Boclair had in his possession a blue hat, two "yellow" metal rings, six $1 bills, a small utility knife, and a lighter. A search of Chism revealed a black leather wallet containing James Harris' driver's license and identification; two packages of cigarettes; two lighters, a dirty, gray pinstripe vest; and a silver-colored necklace. After the search, they went to the police station at 51st and Wentworth Avenue.

Officers Stevens and Gordon took all of the property recovered from defendants and placed it on a table. Harris viewed the items and identified as belonging to him a Bulova watch, the money clip containing five $1 bills, a "yellow" metal ring with a white stone, and the wallet with miscellaneous identification, including a driver's license. He also identified and claimed the crushable tan hat. Harris signed for his wallet and identification; the remaining property was inventoried.

Stevens testified that the inventory slips indicated from which defendant the property was taken. The money was also inventoried. Officer Gordon prepared the inventory slips. Defense counsel requested that property unrelated to this offense be excluded and not shown to the jury. The court did not determine whether the items would go to the jury but allowed the State to elicit testimony concerning the property inventoried at the police station. Stevens stated that the police report did not indicate what property was taken from each defendant; however, the inventory reports did list the property taken from each defendant.

At the arrest scene, Stevens did not speak with Burton or Harris. At the police station, Harris told Stevens that five $1 bills and some change

had been taken from him. The report stated that $8 was recovered. Stevens stated that the $8 consisted of $5 in bills and $3 in coins. Approximately $3 in coins was returned to Harris.

James Burton, testifying for the State, stated that he is employed by the Turning Point Lounge, but he was not an employee of the lounge on August 20, 1979. On the night of the robbery, he left the lounge at 1:30 a.m. and began walking north on State Street. As he crossed 60th and State, he saw some people near a fence. He saw defendant Scott peering through the fence. Burton walked past Scott and looked into the lot of the factory; he saw a man on the ground and three people standing over him. He saw defendant Ollie run toward Harris' car which was parked in the lot. Burton yelled at Ollie to get away from the car and to leave the man alone. Someone stated, "Let's go." The three men walked toward the gate and Scott pushed it open. All four men began walking north on State Street. Burton helped Harris to his feet. While Harris was walking toward his house, Burton saw a police car approaching and flagged it down. He told the policemen what had occurred. The officers left, driving westbound on 60th Street. Burton could see that the police car had stopped in front of a group of people. He went to Harris' home and brought Harris and his wife to the area where the police were standing. He told the police that a fourth man was involved. They found the fourth person hiding in the weeds.

On cross-examination, Burton stated that he had been known as James White and "Hoogey." On the night in question, he had consumed two beers. Burton did not see a knife or a gun in anyone's hand. The police car was unmarked, but he recognized it as a police automobile. He could not describe the clothes worn by any of the defendants.

Defense counsel for Ollie stated that one of the jurors had fallen asleep and was snoring during cross-examination. The court asked whether counsel wanted the juror to be excused, but counsel said that the juror had, by then, awakened.

People's exhibits Nos. 2, 3, 4, 5, and 6, which were the crushable tan hat, the watch, wallet, money clip, and ring, were admitted into evidence. Defense counsel's objection to the admission of inventory slips for the recovered property was overruled. People's exhibits Nos. 7 through 11 were the inventory slips. People's group exhibit No. 13 consisting of a "white" metal Seiko watch, a brown leather holder with food stamps, a brown cigarette lighter, and a tan wide-brimmed hat was admitted into evidence. People's group exhibit No. 15, containing two cigarette lighters, a "white" metal necklace, a black leather money holder, two packages of cigarettes, and a gray vest, was admitted into evidence over defense counsel's objection. People's exhibits Nos. 16 through 18, the inventory

slips referring to the five $1 bills, the black moneyholder, and a void inventory slip, were admitted into evidence over defense counsel's objection. The State then rested.

Defendants Boclair and Scott rested. Sharon Pattanella was called as a defense witness. Her testimony was adopted by Boclair and Scott. She stated that she is an official court reporter and worked in that capacity during defendants' preliminary hearing. Her notes from that preliminary hearing constituted defendant Ollie's exhibit No. 1. Defendant Ollie's exhibit No. 2 was a complete and certified transcript of the hearing. Counsel read from the transcript that Harris, referring to defendants, stated, "Well, they had a butcher knife and they had a toy gun." Counsel read other testimony by Harris that was contradictory to his testimony at trial.

Defendant Ollie rested. Both sides gave closing arguments. Defendant Chism adopted the court reporter's testimony and gave closing arguments. The jury found Boclair, Scott, and Ollie guilty of all charges; the court found Chism guilty of all charges. From those judgments and sentences, defendants appeal.

Defendants contend they were denied a fair trial when evidence of other crimes was admitted by the trial court. Defendants assert that introduction of property recovered from them upon their arrest, and unidentified by Harris, was prejudicial. The State urges that defendants waived this issue since it was not preserved for review in defendants' motions for a new trial.

■■ We agree with the State that this contention was waived on appeal by defendants' failure to include it as grounds in their motions for a new trial. (73 Ill. 2d R. 366(b)(2)(iii); *People v. Castile* (1975), 34 Ill. App. 3d 220, 226, 339 N.E.2d 366, 370-71.) Further, this issue here does not rise to the status of plain error, considering the totality of the State's evidence presented. 73 Ill. 2d R. 615(a).

Defendants contend they were deprived of a fair trial when, in the State's closing argument, the prosecutor commented on the failure of defendants to testify, their failure to call certain witnesses, and stated that the jury would be making a mistake if it did not believe Burton, the State's witness.

Defense counsel objected to the following remark made by the prosecutor:

> "Mr. Harris identified things from each pile as if there were four men, five in a lineup and he picked out each thing that was his, each thing that came from one of those men and that fact remains uncontradicted, unrebutted and undenied."

The objection to this statement was sustained by the trial court. The court

stated that the jury will decide whether this was true. Specific reference to this remark and other alleged prejudicial remarks made by the prosecutor were not presented in defendants' written motions for a new trial.

■■ Defendants' motions for a new trial set forth in a general way that the prosecutor made improper, inflammatory, and prejudicial remarks in his closing argument. In our opinion, failure to specify these errors in a motion for a new trial constituted waiver of these issues, and they cannot be urged as a ground for reversal on review. *People v. Witherspoon* (1975), 33 Ill. App. 3d 12, 21, 337 N.E.2d 454, 461.

Defendants urge this court to apply the holding in *People v. Crossno* (1981), 93 Ill. App. 3d 808, 417 N.E.2d 827. In *Crossno*, the evidence was closely balanced and the statements made by the prosecutor affected substantial rights of defendant and were considered in the appeal under the "plain error" doctrine. (93 Ill. App. 3d 808, 824.) In this case, the statements made by the prosecutor did not affect the substantial rights of defendants. Consequently, the plain error doctrine is inapplicable.

Defendants next contend the trial court erred by sentencing them for unlawful restraint and armed robbery when both charges arose from the same physical act. Defendants assert that the same physical conduct was the basis for both convictions; therefore, only a conviction and sentence for armed robbery should be entered.

■■ Defendants accurately state the general rule that prejudice results to defendants in those instances where more than one offense is carved from the same physical act. (*People v. King* (1977), 66 Ill. 2d 551, 566, 363 N.E.2d 838, 844.) However, the *King* decision clarified the meaning of "act" by stating the following:

> " 'Act' * * * is intended to mean any overt or outward manifestation which will support a different offense. We hold, therefore, that when more than one offense arises from a series of incidental or closely related acts and the offenses are not, by definition, lesser included offenses, convictions with concurrent sentences can be entered." (66 Ill. 2d 551, 566.)

Applying this analysis to the facts before us, we are of the opinion that the offenses of unlawful restraint and armed robbery are based on separate acts, each requiring proof of a different element. (See Ill. Rev. Stat. 1977, ch. 38, pars. 10—3(a), 18—2.) The convictions and sentences for both offenses were, therefore, proper.

Defendants finally contend the trial court erred by imposing a $500 fine on defendant Scott from the money that he had posted as bond.

■■ We disagree. The trial court may impose a fine as part of the sentence for a felony conviction. (Ill. Rev. Stat. 1977, ch. 38, par. 1005—9—1(a)(1).)

Further, the record does not indicate the fine was to be paid from the proceeds of the bond money. There was no error.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

LINN and ROMITI, JJ., concur.