THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* CASIMIRO CRESPO, Defendant-Appellant.

First District (5th Division)   No. 81—3045

Opinion filed October 21, 1983.

Joshua Sachs, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Marie Quinlivan, and Maria Elena Gonzalez, Assistant State's Attorneys, of counsel), for the People.

JUSTICE SULLIVAN delivered the opinion of the court:

Following a bench trial, defendant was convicted of two counts of armed robbery, two counts of armed violence, and two counts of unlawful restraint. He was sentenced to concurrent terms of 10 years on each count of armed robbery and armed violence, but the court imposed no sentence on the two convictions for unlawful restraint ruling that they merged into the armed robbery convictions. On appeal, defendant contends that (1) he was not proved guilty beyond a reasonable doubt; (2) his waiver of a trial by jury was invalid; (3) his right to cross-examine a State witness was erroneously restricted; and (4) the trial court erred in entering judgments and imposing sentences for both armed robbery and armed violence. Although a transcript of the proceedings was unavailable, the parties stipulated to the following testimony and evidence.

Ismael Robles (Robles) testified that he was working in his uncle's tavern when, at approximately 1:30 a.m., two men, subsequently identified as Casimiro Crespo (defendant) and Pablo Gonzalez (Gonzalez), entered the tavern. After a short time, defendant put his hand in his pocket, told everyone to put their hands up, and then ordered them to lie on the floor. When one woman refused to obey, defendant picked her up by her hair and threw her to the floor. Gonzalez went behind

the bar, held a knife to his (Robles) throat, and took money and jewelry from the cash register. Gonzalez then led him at knife-point toward the rear exit of the tavern while defendant went behind the bar and removed money from a drawer and placed it in his pocket. He and Gonzalez were in the rear doorway when the police arrived, and Gonzalez ran outside but was immediately apprehended. On cross-examination, Robles stated that he was 14 years of age, in the seventh grade, and had to repeat a grade in school. He also said that approximately $10 had been taken from the cash register. Robles denied telling an investigator that there were bad feelings in the tavern toward Puerto Ricans or that there had been any altercation between the patrons and the offenders.

Amadore Luchuga (Luchuga), the bartender at the tavern, testified that when he came from the kitchen of the tavern on the night in question, he saw Gonzalez holding a knife to Robles' throat and defendant ordered him to lie on the floor with the customers. He was later ordered to get up and accompany defendant to the kitchen, where two boys were working. At that point, Luchuga managed to escape through the basement and he called the police. When he returned to the bar, the police were there. On cross-examination, Luchuga stated that not all of the money had been removed from the cash register, although he did not know how much was taken. He estimated it to be approximately $100 in one, five and 10-dollar bills.

Officer Schmidt testified that he and his partner were flagged down by a man on the street who told them that a robbery was in progress in the tavern. Upon reaching the rear door of the bar, he saw Gonzalez holding a knife to Robles' throat. When he ordered Gonzalez to stop, Gonzalez released Robles and ran, but was apprehended by his partner. Schmidt then entered the tavern and found defendant behind the bar, holding a small knife. A search of defendant produced $21 and a watch which belonged to a patron, Jesus Rivera. He also found jewelry and money on the floor in the bathroom, as well as $140 in the possession of Gonzalez. On cross-examination, Schmidt recalled that he had inventoried $147 in various denominations, including two $50 bills. Luchuga told him that approximately $70 was taken from the cash register and customers reported losses totaling $79.

Jesus Rivera (Rivera) testified that on the night in question defendant and Gonzalez entered the bar and, after standing in the bar for a few minutes, defendant put his hand inside his coat, said "this is an assault," and ordered everyone to lie on the floor. Defendant threw one woman to the floor and kicked him (Rivera) and another patron. Defendant then ordered the patrons to give him all of their

money and threatened to shoou anyone who withheld any. He then took his (Rivera's) wallet and pulled his watch from his wrist, breaking the band. Luchuga came out of the kitchen and was ordered to lie on the floor, but as defendant went to gather other people from the rear of the tavern, Luchuga ran to the basement. The police arrived shortly thereafter, and his watch and some money were recovered from defendant. Rivera denied that the tavern patrons had been involved in a fight with defendant and Gonzalez.

It was also stipulated that, if called, Investigator Bracek would have testified that Robles told him there had been a small altercation between the offenders and the patrons after the police arrived and that Robles also said that, although there were unfriendly feelings toward Puerto Ricans, no fight had taken place in the tavern prior to the arrival of police.

Defendant testified that on the night in question, he and Gonzalez stopped at the tavern to buy some beer. Because there were some women in the bar, they decided to stay for a short time. As they were drinking, an unidentified male Mexican approached him and inquired about his nationality. When he (defendant) replied that he was Puerto Rican, the Mexican told him to leave because Puerto Ricans were not welcome there. Defendant ignored him until he made disparaging remarks which provoked a fight. Several men attacked him, and a bartender brought out a gun and threatened to shoot him. Gonzalez then went behind the bar and picked up a knife, and in an effort to protect himself, he (defendant) grabbed a woman sitting nearby and warned the bartender, "If you shoot, I am going to cut this lady's throat." At that point, the police arrived and arrested him without allowing him to relate what had occurred. He denied robbing the tavern or any of its patrons. On cross-examination, he admitted that he had seen Gonzalez holding a knife to Robles' throat and that when the police arrived he was holding a knife and the customers were on the floor, but he denied that the police found Rivera's watch in his pocket or that he had ordered the people to lie on the floor.

■ Defendant first contends that he was not proved guilty beyond a reasonable doubt. He maintains that the testimony of prosecution witnesses was impeached and untrustworthy; that the court did not give his exculpatory testimony the weight to which it was entitled; and that the trial court's finding of guilt was erroneous as a matter of law.

It is the function of the trier of fact to determine the credibility of witnesses and to resolve conflicts in testimony (*People v. Kline* (1982), 92 Ill. 2d 490, 442 N.E.2d 154; *People v. Manion* (1977), 67 Ill. 2d

564, 367 N.E.2d 1313), and in doing so, the fact finder is not required to believe the defendant's exculpatory testimony (*People v. Adams* (1979), 71 Ill. App. 3d 70, 388 N.E.2d 1326); rather, it must consider the evidence as a whole, weighing all the circumstances of the incident and the testimony of the other witnesses in assessing the plausibility of the accused's version of events (*People v. Zolidis* (1983), 115 Ill. App. 3d 669, 450 N.E.2d 1290). Even where there are minor discrepancies in testimony (*People v. Winfield* (1983), 113 Ill. App. 3d 818, 447 N.E.2d 1029), a reviewing court will not reverse a conviction unless the evidence is so unreasonable, improbable or unsatisfactory as to leave a reasonable doubt as to defendant's guilt (*People v. Yarbrough* (1977), 67 Ill. 2d 222, 227, 367 N.E.2d 666). Moreover, the testimony of a single credible witness is sufficient to sustain a conviction. *People v. Jones* (1975), 60 Ill. 2d 300, 325 N.E.2d 601.

In our view, the evidence in the instant case is not only reasonable and probable, but is overwhelming. Although defendant maintains that the testimony of Robles should not be believed because of his age, low intelligence, and his impeachment on collateral matters, we note that Rivera testified to substantially the same events as Robles, and their version of what happened was also corroborated in part by the observations of Luchuga and Officer Schmidt as well as by the discovery of Rivera's watch and cash in defendant's possession.

Defendant's further assertion, that the discrepancies between the testimony of witnesses concerning the amount of money taken renders their testimony untrustworthy, is also without merit. We have often stated that minor inconsistencies in testimony of witnesses are matters for the trier of fact to weigh and resolve (*People v. Winfield*), and we do not believe, given the overwhelming evidence in this case, that the discrepancies rendered the evidence so unsatisfactory as to leave a reasonable doubt of guilt as to each of the charges.

■ Defendant next contends that his waiver of a jury trial was invalid because there is no evidence that it was knowingly or understandingly made. He argues that he was given "incomplete admonishments" by the court regarding the nature of the right he was waiving and that there is a serious question as to whether his English was adequate to understand the proceedings without an interpreter. At the outset of trial, the following exchange took place:

"MR. RADAKOVICH [defense counsel]: *** We are ready to begin.

THE COURT: Bench or jury?

MR. RADAKOVICH: Bench.

THE COURT: Mr. Crespo and Mr. Gonzalez, each of you

heard your attorneys indicate that it is your wish to have the Court hear your case sitting without a jury. This means that each of you will not have the opportunity of exercising your constitutional right of having a jury in this case. Each of you have a constitutional right of having a jury hear the case without the Court being the finder of facts. That is a right individual to each one of you and you have to tell me what your wish is. Mr. Crespo, what is your wish, a bench or jury?

DEFENDANT CRESPO: A bench.

THE COURT: Have them execute a jury waiver. *** Do we need an interpreter?

MR. RADAKOVICH: I think it might be advisable.

THE COURT: Call up for an interpreter.

DEPUTY SHERIFF: We have one here. ***

MR. RADAKOVICH: I'm tendering a jury waiver executed by my client, Casimiro Crespo, after being admonished by the Court here in English and by myself in Spanish on prior occasions."

Because the decision depends upon the facts and circumstances of each case (*People v. Spain* (1980), 91 Ill. App. 3d 900, 415 N.E.2d 456), there is no precise formula for determining whether a jury waiver is understandingly made (*People v. Lewis* (1980), 89 Ill. App. 3d 840, 412 N.E.2d 565); however, a waiver will not be held invalid where the defendant, with counsel at his side, unambiguously chooses a bench trial, unless some prejudice to him is alleged and proved (*People v. Akis* (1976), 63 Ill. 2d 296, 347 N.E.2d 733; *People v. Murrell* (1975), 60 Ill. 2d 287, 326 N.E.2d 762).

Here, defendant asserts that he was prejudiced because the court did not advise him of facts concerning the composition of a jury and his right to challenge prospective jurors. However, he does not cite, nor has our research discovered, any authority to support his position that, absent such information, his waiver was ineffective. In fact, we have held that although a court "may not perfunctorily discharge its duty to explain the right to a jury trial to an accused, an explanation of the ramifications of a waiver of that right is unnecessary ***" (*People v. Villareal* (1983), 114 Ill. App. 3d 389, 392, 449 N.E.2d 198, 200), and that " '[m]erely because the court did not at length discuss the consequences of the jury waiver does not necessarily require a holding that the waiver was not understandingly made ***' " (*People v. Jones* (1981), 93 Ill. App. 3d 475, 480, 417 N.E.2d 647, 651). Here, the trial court explained to defendant that he had a right to a trial by jury and that a waiver of that right would result in the court acting

as fact finder. We find no prejudice to defendant because he was not advised of the jury composition or that jurors could be challenged.

Defendant further argues that he suffered prejudice as a result of his linguistic handicap. He does not expressly assert that he could not understand English, but suggests that there is some question as to whether his jury waiver was knowingly made in the absence of an interpreter. However, we note that after defendant's attorney, in open court with defendant present, indicated his choice of a bench trial, defendant was personally admonished by the court regarding his constitutional right to have a jury hear the case; that when questioned by the court, defendant responded, in English, that he preferred a bench trial; that he subsequently executed a written jury waiver; that his attorney, in the presence of and without objection from defendant, stated for the record that he had admonished defendant in Spanish concerning his right to have a jury; and that during the trial, defendant testified without assistance from the interpreter who was available. Moreover, where a linguistic handicap is at issue on appeal, a reviewing court "should accord more than ordinary deference to the conclusions of the trial judge, who observed the witness' demeanor and gestures" and who could determine whether the waiver was knowingly made. (*People v. Ortiz* (1981), 96 Ill. App. 3d 497, 503, 421 N.E.2d 556, 560.) Here, the court concluded that "each of the defendants understood what a jury waiver was and what rights they were losing by saying that they didn't wish to have a jury trial ***," and we are in accord with this conclusion.

Defendant also contends that the trial court erroneously restricted his right to cross-examine a State witness concerning the amount of money taken from the tavern's cash register.

While cross-examination of an adverse witness is a matter of right (*People v. Richmond* (1980), 84 Ill. App. 3d 1017, 406 N.E.2d 135), the scope of cross-examination is within the discretion of the trial court (*People v. Blakes* (1976), 63 Ill. 2d 354, 348 N.E.2d 170), and its rulings will not be reversed absent a clear abuse of discretion resulting in manifest prejudice to defendant (*People v. Burris* (1971), 49 Ill. 2d 98, 273 N.E.2d 605).

Defendant argues that the amount and denominations of money taken by the police from him and Gonzalez did not correspond to those which the State witnesses testified had been taken. Positing that these discrepancies were an important subject of inquiry because they supported his version of events, he maintains that the trial court abused its discretion by preventing him from cross-examining Luchuga concerning them.

Initially, we note that Luchuga stated on cross-examination that although he did not know how much money had been taken, he estimated it to be approximately $100, and when asked if he had told the police that $70 was taken, he responded "we were not sure." When counsel then asked whether he told the police how much money he thought was taken, the court stated, "I am not going to get involved with whether it was $70 or $100 ***," thus indicating that he was aware of the discrepancy concerning how much was taken.

While defendant suggests that this was "an important area of inquiry," no such statement was made to the trial court, and we fail to see its importance in view of the fact that in armed robbery it is not necessary to establish the value of the property. (Ill. Rev. Stat. 1981, ch. 38, pars. 18—1, 18—2; *People v. Lawler* (1961), 23 Ill. 2d 38, 177 N.E.2d 183.) Moreover, Officer Schmidt testified that Luchuga told him that $70 was taken. Thus, the inconsistency as to the amount of money taken was before the court, and because defendant asked no questions concerning the denominations of the money taken, we see no prejudicial restriction of defendant's right to cross-examine as to the amount of and the denominations of the money taken. See *People v. Kline* (1982), 92 Ill. 2d 490, 442 N.E.2d 154.

■ Defendant's final contention is that the trial court erred in imposing sentences on the convictions for both armed robbery and armed violence based on unlawful restraint. We believe that the recent supreme court decision in *People v. Wisslead* (1983), 94 Ill. 2d 190, 446 N.E.2d 512, is dispositive as to the armed violence sentences. There, the court held that a charge of armed violence cannot be founded upon the underlying felony of unlawful restraint and declared the armed violence statute unconstitutional as applied to the unlawful restraint statute.

The State argues at great length that the reasoning in *Wisslead* is faulty and urges us to reject the majority opinion and to adopt, instead, the more "well-reasoned and practical" dissent which would uphold a conviction of armed violence predicated upon unlawful restraint. However, it is fundamental to our judicial system that "once our supreme court declares the law on any point, its decision is binding on all Illinois courts," and we cannot refuse to follow it because we have no authority to overrule or modify supreme court decisions (*People v. Jones* (1983), 114 Ill. App. 3d 576, 585, 449 N.E.2d 547, 555). Therefore, in accordance with *Wisslead*, we must reject the State's arguments and vacate defendant's convictions and sentences for armed violence. See *People v. Alexander* (1983), 118 Ill. App. 3d 33.

■ Anticipating our refusal to reject the ruling of the supreme court on this matter, the State alternatively argues that we should remand this case for imposition of sentences on defendant's convictions of unlawful restraint because the convictions for armed robbery and unlawful restraint arose from separate, albeit closely related, physical acts which were sufficient to support separate convictions.

The general rules on the merger of offenses were set forth in *People v. King* (1977), 66 Ill. 2d 551, 363 N.E.2d 838, wherein the court expressly rejected the "independent motivation" test of *People v. Stewart* (1970), 45 Ill. 2d 310, 259 N.E.2d 24, under which a defendant could not be convicted and sentenced for two offenses if they arose out of the same conduct. The focus of that test was defendant's overall criminal objective at the time the acts were committed. The *King* court adopted, instead, the "separate and distinct acts" standard, stating "when more than one offense arises from a series of incidental or closely related acts and the offenses are not, by definition, lesser included offenses, convictions with concurrent sentences can be entered." (*People v. King* (1977), 66 Ill. 2d 551, 566, 363 N.E.2d 838, 845.) "Act" was defined as "any overt or outward manifestation which will support a different offense." 66 Ill. 2d 551, 566, 363 N.E.2d 838, 844-45.

Applying this analysis to the instant case, we initially note that unlawful restraint is committed when a person knowingly and without legal authority detains another (Ill. Rev. Stat. 1977, ch. 38, par. 10—3); whereas, armed robbery is committed when a person takes property from a person by the use of force or by threatening the imminent use of force (Ill. Rev. Stat. 1977, ch. 38, par. 18—1) while armed with a dangerous weapon (Ill. Rev. Stat. 1977, ch. 38, par. 18—2). Thus, unlawful restraint is not a lesser-included offense of armed robbery, as the two crimes require proof of different elements. *People v. Boclair* (1982), 106 Ill. App. 3d 515, 435 N.E.2d 1237.

■ The question remains then, whether defendant committed separate "acts" which would support convictions for both armed robbery and unlawful restraint. Defendant argues that the very essence of armed robbery involves temporary restraint of the victim and that the acts supporting unlawful restraint in this case were limited to those necessary to supply the element of force and to accomplish the robbery. We disagree. The crime of unlawful restraint was committed when defendant forced the tavern customers to lie on the floor and when Gonzalez held Robles at knife-point both during and after the commission of the robbery. Neither of these acts was necessary to effectuate the robbery, and each exceeded the "force" requirement of

the armed robbery statute which was satisfied when defendant threatened to shoot anyone who withheld money and when Gonzalez produced a knife after defendant announced their intent to rob the tavern. Although the purpose of restraining the victims may have been to facilitate the commission of the robbery, we have already noted that under *King*, the offender's general criminal objective is no longer the standard by which the propriety of multiple convictions with concurrent sentences is determined. So long as there were separate and distinct acts, such as those here, which would constitute a crime which is not a lesser-included offense of the more serious crime charged, conviction and concurrent sentencing for both offenses is proper.

For the reasons stated, we affirm the convictions and sentences for armed robbery, vacate the convictions and sentences for armed violence, and affirm the convictions for unlawful restraint and remand with a direction that the trial court impose sentences on the unlawful restraint convictions.

Affirmed in part.

Vacated in part and remanded with direction.

WILSON, P.J., and LORENZ, J., concur.