THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
LA VANCE PARSON, Defendant-Appellant.

First District (1st Division) No. 1—89—0990

Opinion filed April 26, 1993.—Supplemental and modified opinion
filed December 13, 1993.

Rita A. Fry, Public Defender, of Chicago (Greg Koster, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Celeste Stewart Stack, Special Assistant State's Attorney, and Renee Goldfarb and William D. Carroll, Assistant State's Attorneys, of counsel), for the People.

JUSTICE CAMPBELL delivered the opinion of the court:

Following a jury trial, defendant, La Vance Parson,[1] was found guilty of murder and two counts of attempted murder and sentenced to a prison term of 40 years for the murder conviction and to two terms of 20 years each for the attempted murder convictions. The mittimus stated the sentences were to run consecutively. On appeal, defendant contends that: (1) the prosecutor made improper remarks during closing argument which denied his right to a fair trial; (2) the trial court's instructions on attempted murder improperly allowed the jury to find the defendant guilty of attempted murder without finding a specific intent to kill; (3) he was improperly convicted on two murder counts where only one person was killed; (4) the trial court improperly increased his sentence by written order; (5) the trial court erred in imposing consecutive sentences; (6) the trial court erred in refusing to consider his rehabilitative potential; and (7) the trial court erred in refusing to answer the written questions of the jury regarding instructions submitted to the court during the jury's deliberations. For the following reasons, we affirm defendant's conviction, remanding this cause for the sole purpose of clarifying defendant's sentence and correcting the mittimus.

---

[1] Defendant's surname is spelled alternatively "Parson" and "Parsons" throughout the record on appeal. In his brief, defendant's name is spelled "Parson," while in the State's brief, defendant's name is spelled "Parsons." Defendant's notice of appeal identifies him as both "Parsons" and "Parson." As the latter spelling is found in defendant's own signature, this court has determined "Parson" the proper spelling of defendant's name.

THE TRIAL

The following facts were adduced at trial. On April 17, 1987, at 1 a.m., eight young people stepped out of a first-floor elevator at 3737 South Federal Avenue, Chicago, Cook County, Illinois, and were assailed with gunfire. As a result of the shooting, James Atkins, Jr., was killed and Raymond Spain and Darryl Davis were injured. At trial, William Martin Dossance testified, on behalf of the State, that in 1987 he was in the United States Army stationed at Fort Campbell, Kentucky. In April of that year, he, Atkins and Von Thomas, who were all in the same Army unit, received a three-day pass and drove to Chicago. The three men arrived in Chicago just past midnight on April 17, and proceeded to 35th and State Streets, where they met up with Dossance's brother, Melchor Spain, his cousin, Raymond Spain, Darryl Davis, Yolanda Spain and Ronald Daney. Together, all eight visited Rose Williams, Raymond's girl friend, in her apartment on the eighth floor of 3737 South Federal Avenue.

After approximately 45 minutes, the group left Williams' apartment, taking the elevator down to the first floor. When the elevator door opened on the first floor, Dossance saw two young men standing outside of the elevator; one standing directly in front of the elevator was wearing a light blue jacket with a black "Fila" baseball cap and the other, standing five to six feet away from the elevator, was wearing a gold "Dunbar" shirt and red sweat pants. Dossance identified the defendant in court as the individual wearing the gold shirt and red sweat pants. The other individual was subsequently identified as Anthony Thomas.

Yolanda and Raymond Spain were the first to get out of the elevator. Dossance, Melchor Spain, and Daney followed, with Atkins, Thomas and Davis behind them. They all turned right and began walking toward the building exit, away from the defendant and Thomas. Suddenly, the group heard gunshots being fired from behind them, coming from all directions. Dossance ran out of the building, down a ramp and through an open field. When he got to the street, he turned, noticed Yolanda and Thomas behind him, and flagged down a police car. When he returned to the scene, Dossance found Atkins lying on the sidewalk, bleeding out of his mouth. Later that day, Dossance identified defendant and Thomas in a police lineup.

Yolanda Spain testified to the same essential facts as Dossance. In addition, she stated that the hallway by the elevator was well lit.

When she heard the gunshots, Raymond pushed her and told her to run. She ran down the outside stairs of the building, and when she reached the bottom, turned to look back into the building. At that time, she saw Thomas holding and firing a silver gun, as defendant stood beside him. Defendant and Thomas moved from the doorway and ran through the columns of the building. They ran down the stairway together, right past Yolanda. All the while, Thomas was firing his gun. When she could no longer see the two men, Yolanda ran over to Dossance and they ran to the next building and waited for the police. Later that day, Yolanda also identified defendant and Thomas in a police lineup.

Raymond Spain testified, corroborating the testimony of Dossance and Yolanda regarding the events of April 17, 1987. Raymond further testified that Ronald Daney was a member of the Del Vikings street gang. When he heard the gunfire from behind him, Raymond pushed Yolanda, told her to run and then ran himself. He then heard more gunfire, coming from all around him. He ran toward the pillars of the building and then ran between them. As he was running between the pillars, he was hit by a bullet in his lower back. He continued to run, and then felt another bullet hit him in the back of the head. He continued running out of the building heading westward. He turned on the sidewalk, running south towards 39th Street, ran down to the next building and hid behind an oak tree. As he was running, he continued to hear gunshots. Raymond stayed hidden behind the tree until his cousin, Melchor, arrived. Raymond told Melchor that he had been hit, and Melchor stayed with him until the police came and took him to Michael Reese Hospital.

Raymond was hospitalized for six days, and had surgery to remove his gallbladder and kidney, and additional surgery on his liver. Approximately one year later, Raymond returned to the hospital for additional surgery on his bowels as a result of scar lesions from his previous surgery.

Darryl Davis also testified on behalf of the State to the same essential facts as the previous prosecution witnesses. When he exited the elevator, he saw defendant and Thomas standing side by side. Thomas took a silver gun from his belt and started shooting at the group. Davis started running to the right, toward the building exit, and then ran to the top of the stairs. When he reached the stairwell, he was shot in the chest while trying to jump off of the stairs. Davis continued running, and when he reached the bottom of the stairwell, he ran west toward Federal Avenue. As he ran, he

heard more gunshots fired. He ran to the Dan Ryan "el" station at 35th Street and flagged down a police car. An ambulance arrived and transported him to Michael Reese Hospital. Later that day he identified defendant and Thomas in a lineup.

The parties stipulated to the testimony of Dr. Eupil Choi, of the Cook County medical examiner's office. Dr. Choi performed an autopsy on James Atkins, Jr., and found three fatal gunshot wounds to Atkins' body, all entering through Atkins' back.

The parties further stipulated to the testimony of Dr. Tolitano. Dr. Tolitano performed surgery on Raymond Spain and found an irreparable bullet wound through Raymond's right kidney, and wounds to Raymond's gallbladder and liver. Dr. Tolitano removed Raymond's gallbladder and a portion of his liver. Dr. Tolitano further treated a gunshot wound to Raymond's head. Dr. Tolitano also treated Davis for a gunshot wound to his chest.

Next, Chicago police officer Alan Szudarski testified that on April 17, 1987, he investigated a shooting at the 3700 block of South Federal. Officer Szudarski found Atkins lying across the street from 3737 South Federal, face down, shoeless, and with three bullet wounds in his back. From previous investigations, Officer Szudarski was aware that the building was controlled by the Disciples street gang. The Del Vikings, a rival gang, controlled two buildings on South State Street, approximately a half block east of the building at 3737 Federal Avenue.

Officer Szudarski left the scene and travelled to Michael Reese Hospital, where he interviewed Raymond Spain and Darryl Davis. At approximately 5:30 a.m., Officer Szudarski interviewed Rose Williams, Ronald Daney and the Spain family members. At 7 a.m., Officer Szudarski proceeded to 3919 South Federal Avenue, where he arrested defendant. The officer read defendant his rights, and defendant stated that he understood them. Officer Szudarski then left the police station and continued his investigation, arresting Anthony and Louis Williams, Anthony Thomas, Victor Pickens, and Randolph Ellis.

At approximately 10:45 a.m., Officer Szudarski spoke to defendant's mother and then allowed her to speak to defendant. Assistant State's Attorney Joel Leighton arrived at 2 p.m., and at 6 p.m., he interviewed defendant for 10 to 15 minutes in the presence of youth officer Ronald Mohrs and Officer Segers. At 9 p.m., Leighton returned to defendant's holding cell and read defendant's statement to him. Defendant made corrections and signed the statement.

On cross-examination, Officer Szudarski testified that when he arrived at defendant's apartment to arrest him, defendant was asleep in his bed. At that time, defendant was bare-chested and wearing red sweat pants. The officer denied going through any drawers. When defendant was awakened by the police, he put on a goldenrod-colored "Dunbar" t-shirt.

Assistant State's Attorney Joel Leighton then testified on behalf of the State to the same essential facts regarding defendant's interview procedure on April 17, 1987. Leighton informed defendant that witnesses identified him and Thomas in a lineup, regarding the shooting at 3737 South Federal. Leighton advised defendant of his constitutional rights, and defendant responded that he understood them. Leighton also asked defendant if he wanted his mother present during the interview, and defendant said he did not want her there.

Defendant stated that he went to 3737 South Federal at around 1:30 a.m. on April 17, 1987, and that while he was there he met Louis Williams, Anthony Williams, Randy Ellis, Gage (Gerald Jeter), Iced Tea (Anthony Thomas) and Victor Pickens. Defendant stated that he knew these individuals because they were all members of the Black Gangster Disciples street gang, of which defendant was also a member. Defendant stated that Anthony Williams told him and the Black Gangster Disciples that a person named "Rank" was in the building and that Rank was a member of the Del Vikings. Anthony Williams asked Gerald Jeter where the shotguns were to get Rank. Gerald Jeter said he did not know where the shotguns were. At this point, Anthony Williams told defendant and the other members of the group to go to various locations around the building at 3737 South Federal and wait for Rank and the people to come out of the building.

Defendant stated that at Anthony Williams' direction, he went to the elevators with Victor Pickens and Anthony Thomas. A short time later, Rank came out of the elevator, along with a group of people. Anthony Thomas produced a handgun, and Victor Pickens ran. Defendant and Anthony Thomas followed Rank and the group down the hallway a short distance and then Anthony Thomas fired four or five shots into the group. Defendant stated that he heard 15 to 20 more shots coming from other places. Defendant then ran back into the building and hid until he saw the police leave, then he went home.

Leighton wrote out a summary of defendant's statement and read it to defendant. Defendant changed the time of the incident from 1:30 to 1:15 a.m. and signed the statement.

On cross-examination, Leighton denied telling defendant that he was not a subject of the investigation of the incident. Leighton also stated that defendant told him he was either a freshman at Dunbar high school or that he was in the eighth grade. At the close of the State's case, the trial court denied defendant's motion for a directed finding of acquittal.

Kimulette Spinks, defendant's sister, then testified on defendant's behalf. Spinks stated that on April 17, 1987, during the early morning hours, she was at home in bed. Defendant had been out that night, but had returned home at midnight or 12:30 a.m. At that time, defendant was wearing a blue corduroy jacket that belonged to Spinks. At around 8 a.m., the police arrived at Spinks' apartment. Spinks opened the door and unlocked the gate, and the police came in. The police did not show her a warrant. The police searched the rooms, looking under all of the mattresses and in drawers. When they found defendant, the police told him to put on his shoes and get a coat, because they were taking him down to the station to answer some questions.

Next, Susan Nichols testified that in 1987 she was defendant's classroom teacher at Central Baptist Family Services. The Central Baptist Institute is a special school for learning disabled students, who are referred by the Chicago Board of Education. Nichols was defendant's teacher for approximately 1½ years. In April 1987, Nichols evaluated defendant for reading, math and spelling. At that time, defendant's word recognition, spelling and comprehension skills were at first-grade level, and his math skills were at the third-grade level.

Defendant then testified on his own behalf. Defendant stated that on April 17, 1987, he returned to his apartment at 1 a.m or 1:15 a.m. and went to sleep. The police awakened him in the morning, told him to step aside and began searching the room. They turned over his mattress and started going through drawers. The officers then told defendant to get dressed and that they were taking him down to the station for questioning. At that time, defendant put on red "snap-down" pants and a yellow "Dunbar" t-shirt.

The police took defendant to the police station and left him alone in a steel room. About five or six hours later, defendant saw his mother. Defendant stated that on the prior evening, defendant went to a party on the seventh floor of the State wing, two build-

ings down from his building. He was accompanied by Victor Pickens. Defendant and Pickens stayed at the party for three to four hours, then began to walk home. As they were walking home, they heard shots and started running to defendant's apartment. Defendant did not see anybody shooting. When he arrived home, defendant told his sister that he heard shots, but that he did not know if they were shooting at him. Defendant then watched TV and fell asleep. At that time, defendant stated that he was wearing Burgundy dress pants and a dress shirt with a blue corduroy jacket. Defendant stated that at no time on the evening of April 16 or in the early morning hours of April 17 was he dressed in a yellow Dunbar sweater or red button-up pants until after he was awakened by the police.

At the police station, the police asked defendant where he was during the shooting and he told the police that he went to a party with Victor Pickens, that he was not in a gang, and that he had nothing to do with the shooting. Defendant appeared in a lineup, then made the same statement to Assistant State's Attorney Leighton. Defendant testified that what Leighton wrote down was not true and that defendant only signed the statement so that he could go home.

On cross-examination, defendant stated that neither Victor Pickens nor Anthony Thomas is a member of a gang. Defendant was aware that 3737 South Federal is a Disciples building. Defendant stated that he did not see Anthony Thomas that night. Defendant testified that Dossance, Raymond Spain, Yolanda Spain and Darryl Davis were all lying when they testified as to the events of April 17, 1987.

The defense rested, and the trial court held an instruction conference. The instructions given were tendered without objection except for Illinois Pattern Jury Instructions, Criminal, No. 3.11 (2d ed. 1981), regarding the believability of a witness, which was tendered by defendant and given over the objection of the State. Both sides presented closing arguments, and the jury found defendant guilty of murder and two counts of attempted murder. Defendant's timely appeal followed.

OPINION

Initially, defendant contends that the prosecutor made prejudicial remarks during closing argument, thereby denying him a fair trial. Defendant objects to the following remarks made by the prosecutor:

"What do you have to believe to believe his testimony? You would have to believe that Yolanda Spain is a liar. You have to believe William Dossance, United States Army, a liar. Raymond Spain, shot in the back, a liar. Darryl Davis, shot in the chest, a liar.

It is worse than that, though. You have to believe Detective Szudarski is a liar, that Youth Officer Mohrs is a liar *** . ***

Then he calls ASA Leighton, an assistant state's attorney, an attorney licensed to practice in the State of Illinois. He says, you know Bill, we know LaVance did not have anything to do with it, but we are just going to frame him. Why don't you just make up a statement?"

Defendant argues that the prosecutor's above comments are grounds for reversal because they misstate the burden of proof, incorrectly stating what the jury must find to reach a certain verdict.

Defendant made no objections to these statements at trial nor did he address them in his post-trial motion. As such defendant has waived this issue for review. *People v. Enoch* (1988), 122 Ill. 2d 176, 522 N.E.2d 1124.

■ Even if defendant had preserved this issue for consideration, closing comments similar to those presented by the State in the present case have been allowed and found not prejudicial where the prosecution's version of the incident varies substantially from the version given by the defense. (*People v. Pecoraro* (1991), 144 Ill. 2d 1, 16, 578 N.E.2d 942.) In *Pecoraro*, the defendant was found guilty of murder. At trial, the testimony of the State's witnesses differed considerably from defendant's version of the occurrence. In closing argument, the prosecutor stated:

" '[I]f you go back and you—say you come back with something other than a finding of guilty, what you're saying is, Mr. Barbaro, we didn't believe you. *** Officer Becker, we don't believe you either.' " (144 Ill. 2d at 16.)

The supreme court found that under the circumstances, the court appropriately allowed the statements by the prosecution implying that the jury would have to believe one side or the other. See also *People v. Smith* (1987), 158 Ill. App. 3d 595, 600, 511 N.E.2d 770 (court found that prosecution's closing argument that in order to believe the defendant, the jury would have to believe everyone else was lying was basically true, as the versions of the incident varied substantially between the prosecution and the defense).

In the present case, the defendant's version of the incident differed considerably from that given by witnesses for the prosecution.

Moreover, the cases relied upon by defendant in support of his contention, *People v. Crossno* (1981), 93 Ill. App. 3d 808, 417 N.E.2d 827, and *People v. Wilson* (1990), 199 Ill. App. 3d 792, 557 N.E.2d 571, are distinguishable.

In *Crossno*, it was undisputed that a voluntary act of the defendant caused the fatal injury to the victim. The issue before the court, therefore, was defendant's state of mind. In closing argument, the prosecutor informed the jury:

" 'You can either believe the Defendant or you can believe Ann Lowery, Paul King, Kathy Osborne, and Ricky Seaman. If you believe the Defendant *you have got to find him not guilty of everything*. If you believe the other witnesses *you've got to find him guilty of murder and aggravated battery.*' " (Emphasis added.) (*Crossno*, 93 Ill. App. 3d at 821.)

The court noted that a review of the testimony of all the witnesses established that the jury could fully believe the testimony of some if not all of the State's witnesses and still find the defendant not guilty. Thus, the court found that more was involved than the credibility of the State's witnesses, and the prosecutor misstated the law when he said that a finding by the jury that the stories of those witnesses were sincere necessitated verdicts of guilt as to murder and aggravated battery. *Crossno*, 93 Ill. App. 3d at 822.

In *Wilson*, defendant was convicted of attempted criminal assault. This court found that the evidence against the defendant, while sufficient to prove guilt, was not overwhelming. The record further disclosed that the principal witness for the prosecution had a motive to lie about the assault. In closing argument, the prosecutor stated:

" 'Is it curious to anyone the defense would have you believe everybody in this case is guilty except the Defendant? [State's witness] Kondal committed perjury. The State's Attorney is guilty of trying to frame someone. [The victim] is guilty.' " (*Wilson*, 199 Ill. App. 3d at 796.)

We found that the prosecutor's statement was not an instruction to the jury concerning how it must consider the evidence, but rather, that the defendant carried a burden of proof to establish his innocence, and to meet that burden of proof, Wilson was required to show that the State's witnesses had lied. The prosecutor's statement created doubt as to whether the jury applied the proper standard of proof in considering the evidence, and, therefore, the

statement was substantially prejudicial. *Wilson*, 199 Ill. App. 3d at 797.

In the present case, the comments of the prosecutor do not rise to the level of those comments made in *Crossno* and *Wilson*. First, the record indicates that this is not a close case in terms of the evidence. There are no discrepancies between the testimony of the State's witnesses; rather, the testimony of the defendant is irreconcilable with the testimony of the State's witnesses. Second, the prosecutor in the present case does not state what the jury must find in order to reach a certain verdict; the prosecutor merely points out that defendant's testimony is contrary to the testimony of the State's witnesses. Therefore, regardless of waiver, the comments of the prosecutor were not prejudicial and not reversible error.

Next, defendant contends that the jury was improperly instructed as to his attempted murder charges. The record shows that the jury was given a three-part instruction. First, the trial court defined "murder":

"A person commits the offense of murder when he kills an individual if, in performing the acts which cause death, he intends to kill or do great bodily harm to that individual or another; or he knows that such acts will cause death to that individual or another; or he knows that such acts create a strong probability of death or great bodily harm to that individual or another."

After giving this instruction, the trial court defined "attempt" as follows:

"A person commits the offense of attempt when he, with intent to commit the offense of murder, does any act which constitutes a substantial step toward the commission of the offense of murder. The offense attempted need not have been committed."

The court then set forth the necessary elements of attempted murder in the present case:

"To sustain the charge of attempt, the State must prove the following propositions. This is the attempt as to Raymond Spain.

First, that the defendant, or one for whose conduct he is legally responsible, performed an act which constituted a substantial step toward the commission of the offense of murder of Raymond Spain; and second, that the defendant, or one

for whose conduct he is legally responsible, did so with intent to commit the offense of murder of Raymond Spain.

If you find from your consideration of all the evidence that each one of these propositions has been proved beyond a reasonable doubt, you should find the defendant guilty.

If you find from your consideration of all the evidence that any one of these propositions has not been proved beyond a reasonable doubt, you should find the defendant not guilty."

The identical instruction was given regarding the attempted murder of Darryl Davis. Defendant contends that the above jury instructions fail to reflect the requirement of a specific intent to kill, but rather, indicate that intent to do great bodily harm is sufficient to convict a defendant of attempted murder.

It is well settled that the specific intent to kill is an essential element of attempted murder. (*People v. Jones* (1979), 81 Ill. 2d 1, 405 N.E.2d 343; *People v. Harris* (1978), 72 Ill. 2d 16, 377 N.E.2d 28; *People v. Solis* (1991), 216 Ill. App. 3d 11, 19, 576 N.E.2d 120.) However, a party must specifically object to improper jury instructions in a timely manner. " '[T]he failure to object at trial to an asserted error in jury instructions waives the question.' " *Solis*, 216 Ill. App. 3d at 19, quoting *People v. Tannenbaum* (1980), 82 Ill. 2d 177, 180, 415 N.E.2d 1027.) Similarly, "issues not raised in a post-trial motion are effectively waived for appellate review." (*Tannenbaum*, 82 Ill. 2d at 181.) A limited exception to this rule is available to correct a grave instructional error, or where the facts are close and fundamental fairness mandates that the jury be properly instructed. 134 Ill. 2d R. 451(c); *Tannenbaum*, 82 Ill. 2d at 182.

Under certain circumstances, an erroneous jury instruction constitutes harmless error. However, an erroneous intent instruction does not warrant reversal where intent to kill is evident from the circumstances. *Solis*, 216 Ill. App. 3d at 19, citing *People v. Bryant* (1984), 123 Ill. App. 3d 266, 274, 462 N.E.2d 780; *Jones*, 81 Ill. 2d at 9.

Defendant relies on *People v. Bland* (1992), 228 Ill. App. 3d 1080, 593 N.E.2d 639, which is distinguishable from the present case. In *Bland*, the defendant's intent to kill was at issue because his defense was that he intended to harm the victim in response to her solicitation of sex, but did not intend to kill her. The evidence disclosed that the State explicitly told the jury during closing argument that to prove the charge of attempted murder the State had to prove that defendant intended to commit the offense of murder

and that defendant intended to commit great bodily harm. Not once did the State explain that the intent necessary to convict for attempted murder was the intent to kill. The defendant in *Bland* raised the error in his post-trial motion.

■ In the present case, the record shows that defendant neither objected to the instruction at trial nor raised the issue of the improper instruction in his post-trial motion. In addition, the intent to kill is evident from the evidence, which reveals defendant's overwhelming guilt. As such, the jury instruction constituted harmless error.

■ Next, defendant contends that the mittimus erroneously indicates two murder convictions when he was actually convicted of two counts of murder for a single homicide. The "narrative" section of the mittimus indicates that the two murder convictions are merged; however, the "offense" section sets out two separate convictions. In addition, defendant contends that his sentence was improperly increased to 80 years' consecutive imprisonment, after the court pronounced a sentence of 40 years for murder and two 20-year sentences for attempted murder. Defendant points out that the mittimus and the court "half-sheet" both indicate that his sentences are to run consecutively, but the record shows that in pronouncing defendant's sentence, the trial court failed to indicate that defendant's sentences were consecutive. The State does not dispute these discrepancies. Under the circumstances, we find it necessary to remand this cause to the trial court for the limited purpose of correcting the mittimus and clarifying the nature of defendant's sentence.

Defendant further contends that in the event his sentences are intended to run consecutively, the trial court erred in imposing such a sentence. Section 5—8—4 of the Unified Code of Corrections (Corrections Code) provides:

> "(a) *** The court shall not impose consecutive sentences for offenses which were committed as part of a single course of conduct during which there was no substantial change in the nature of the criminal objective, *unless, one of the offenses for which defendant was convicted was a Class X or Class 1 felony and the defendant inflicted severe bodily injury, in which event the court shall enter sentences to run consecutively.* Sentences shall run concurrently unless otherwise specified by the court." (Emphasis added.) (Ill. Rev. Stat. 1987, ch. 38, par. 1005—8—4(a).)

Section 5—8—4 further provides:

"(b) The court shall not impose a consecutive sentence unless, having regard to the nature and circumstances of the offense and the history and character of the defendant, it is of the opinion that such a term is required to protect the public from further criminal conduct by the defendant, the basis for which the court shall set forth in the record." (Ill. Rev. Stat. 1987, ch. 38, par. 1005—8—4(b).)

Defendant argues that the trial court failed to set forth the required finding that consecutive sentencing was necessary to protect the public from defendant's further criminal conduct. In support of his contention, defendant states that prior to the instant offense, his criminal record was limited to one juvenile battery adjudication, for which he received 30 days in the Juvenile Department of Corrections and one year's probation. Defendant further states that his level of participation in the instant offense was minimal because he was merely a "tag-along."

Defendant cites *People v. Pittman* (1982), 93 Ill. 2d 169, 442 N.E.2d 836, for the proposition that the record show that the sentencing court is of the opinion that a consecutive term is necessary for the protection of the public. *Pittman*, 93 Ill. 2d at 178, 442 N.E.2d at 840; see also *People v. O'Neal* (1988), 125 Ill. 2d 291, 298, 531 N.E.2d 366, 369 (consecutive sentences should be imposed sparingly, although a trial court need not actually recite the language of section 5—8—4(b) when imposing a consecutive sentence).

The State argues, however, that the defendant failed to request a statement of reasons for the sentences given, and because the court does not have an independent duty to give a statement of reasons, defendant's argument is waived. (See *People v. Hicks* (1984), 101 Ill. 2d 366, 374, 462 N.E.2d 473, 477; *People v. Woods* (1985), 131 Ill. App. 3d 51, 475 N.E.2d 589.) The *Hicks* and *Woods* courts held that because section 5—8—4(b) is directory rather than mandatory in requiring that the basis for a consecutive sentence be set forth in the record, the requirement could be waived.

■ As mentioned above, it is not clear from the record in the present case as to whether the trial court intended the defendant's sentences to run consecutively. The facts of the present case illustrate, however, that consecutive sentences are appropriate under section 5—8—4(a) of the Corrections Code because defendant was convicted of murder and attempted murder, a Class X felony, for inflicting serious bodily injury upon two victims. (See *People v. Anderson* (1991), 211 Ill. App. 3d 140, 142-43, 569 N.E.2d 1178, 1181 (despite waiver, a separate statutory provision specifically au-

thorized the consecutive sentence imposed in that case).) In the present case, section 5—8—4(a) of the Corrections Code provides separate statutory authority to impose a consecutive sentence upon the defendant.

Defendant further contends that the trial court erred in specifically refusing to consider his rehabilitative potential in sentencing. In sentencing defendant, the trial court stated:

> "[T]here has been reference made by the attorneys, both the prosecution and for the defense, concerning punishment reflecting the possibility of rehabilitation. And I think it ought to be clear in everyone's mind that it is the Court's judgement that a penal institution is not a place where rehabilitation takes place. *** There is no rehabilitation program that exists that is worthy of being named such in any of our penal institutions in the Court's judgement."

The trial court then proceeded to sentence the defendant "purely on the basis of punishment," adding, "And if rehabilitation takes place, fine." The defendant argues that these comments indicated that the trial court failed to consider mitigation and defendant's potential for rehabilitation.

The Illinois Constitution requires that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." (Ill. Const. 1970, art. I, §11; *People v. Harris* (1990), 196 Ill. App. 3d 663, 678, 554 N.E.2d 367.) Absent an abuse of discretion, a sentence is not altered by a reviewing court. *People v. Perruquet* (1977), 68 Ill. 2d 149, 154, 368 N.E.2d 882, 884.

■ In the present case, following a hearing in aggravation and mitigation, the trial judge stated that he was sentencing defendant for the crimes he committed. Defendant has not shown that the trial judge's criticism of rehabilitation programs in the penal system improperly reflected on his sentence.

Defendant further argues that his sentence is excessive because he was only 15 at the time the crimes were committed. In support, defendant cites *People v. Brown* (1993), 243 Ill. App. 3d 170, wherein this court modified the sentence of a 20-year-old defendant from 45 years to 30 years. In that case, the defendant was convicted of first degree murder, and this court determined that the trial court did not adequately consider defendant's rehabilitative potential because the defendant had no criminal background. *Brown*, 243 Ill. App. 3d at 176.

■ *Brown* is distinguishable from the present case, because the record here indicates that the defendant has a criminal background. Moreover, defendant's sentences of 40 years for murder and 20 years for each attempted murder conviction are well within the statutory guidelines for those crimes. (See Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—1(a)(1) (murder is punishable with a term of not less than 20 years and not more than 40); see also Ill. Rev. Stat. 1985, ch. 38, pars. 8—4(c)(1), 1005—8—1(a)(3) (attempted murder is a Class X felony punishable with a term of not less than 6 and not more than 30 years).) We therefore find defendant's sentences for murder and attempted murder proper.

Finally, defendant contends that the trial court erred in refusing to answer questions submitted to the trial judge by the deliberating jury. The record shows that the jury was instructed as to the definition of "accountability" as is provided by Illinois Pattern Jury Instructions for criminal cases. During deliberations, the jury sent a note to the court which stated: "Are you legally responsible for the conduct of another person simply by being at the scene of the crime?" The record shows that in response to this, the trial judge wrote back, "Read your instructions." The jury then sent another note to the trial judge which stated: "Your Honor, We have a problem with the legal responsibility for the conduct of another. Is knowing of or simply being at the scene the same as aiding and abetting? We have read the instructions and have many questions." To this the trial judge wrote back, *"Please* read your instructions." (Emphasis in original.) Defendant argues that the trial court's failure to answer these questions denied him a fair trial.

The instructions relating to accountability (Illinois Pattern Jury Instructions, Criminal, No. 5.03 (2d ed. 1981)), were stated by the court when the judge gave instructions as follows:

"A person is legally responsible for the conduct of another person when, either before or during the commission of an offense, and with the intent to promote or facilitate the commission of that offense, he knowingly solicits, aids, abets, agrees to aid, or attempts to aid the other person in the planning or commission of the offense."

The general rule as to clarification of instructions is set forth in *People v. Harmon* (1968), 104 Ill. App. 2d 294, 301, 244 N.E.2d 358, 361, as follows:

"If jurors differ as to the instructions they should come into court and have them repeated, or if they wish more information as to the law they should request it of the court, and it

has been held that it is not only the right but the duty of the court to reinstruct on any question of law arising from the facts on which the jury say they are in doubt, and on which they ask further instructions. Where the jury make their difficulties explicit, the judge should clear them away with concrete accuracy; and where the question asked is not clear, it is the duty of the court to seek clarification."

However, the general rule is tempered by the rule that the trial court may properly exercise its discretion and decline to answer the jury's inquiries where the given jury instructions are readily understandable and sufficiently explain the relevant law. *People v. Palmer* (1982), 111 Ill. App. 3d 800, 807, 444 N.E.2d 678, 683.

Defendant relies on *People v. Shannon* (1990), 206 Ill. App. 3d 310, 564 N.E.2d 198. There, the defendant was convicted of aggravated battery for striking the victim in the head with a piece of concrete. The instructions given were a combination of instructions relating to aggravated battery. During deliberations, the jury sent a note to the trial judge stating: "On the first proposition for Agg. Batt. clarify is it intent to throw the Rock and it Resulted in great Bodily Harm or is it to throw it the Rock intending to do great Bodily Harm." The defense counsel requested that the court inform the jury that the latter definition was correct and the trial court refused, telling the jurors to read the instructions and use their common sense. *Shannon*, 206 Ill. App. 3d at 316.

On appeal, the court reversed and remanded the cause for a new trial. The court found that although normally the Illinois Pattern Jury Instructions as to aggravated battery are readily understandable, because of the unusual facts of the case, the instructions at issue were not readily understandable because no instructions were given relative to the presumption that a person intends the natural and probable consequences of his act. Thus, when the jury indicated confusion as to whether the required "intent" was to throw the rock, doing great bodily harm, as contrasted with throwing the rock intending to do great bodily harm, additional clarification was required.

■ *Shannon* is distinguishable from the present case. Here, there was no odd combination instruction given which omitted a necessary proposition. Furthermore, there is no unusual fact situation which requires additional instruction. Thus, we find the instruction in the present case readily understandable and the trial court's response to the jury's inquiry proper.

For the reasons stated, we affirm defendant's conviction, but remand this cause to the trial court for the sole purpose of clarifying the nature of defendant's sentence and correcting the mittimus with regard to defendant's murder conviction, if necessary.

Affirmed and remanded.

BUCKLEY and O'CONNOR, JJ., concur.

## SUPPLEMENTAL AND MODIFIED OPINION

JUSTICE CAMPBELL delivered the opinion of the court:

Following a jury trial, La Vance Parson was found guilty of the murder of James Atkins, Jr., and of the attempted murders of Raymond Spain and Darryl Davis, and sentenced to a prison term of 40 years for the murder conviction and two terms of 20 years each for the attempted murder convictions. The mittimus stated the sentences to run consecutively. On appeal, this court affirmed defendant's convictions, remanding the matter to the trial court for the sole purpose of clarifying defendant's sentence and correcting the mittimus, which this court found to be inconsistent with the trial court's sentencing order. *People v. Parson* (1993), 249 Ill. App. 3d 1021.

In a related case, *People v. Jeter* (1993), 247 Ill. App. 3d 120, the sixth division of this court affirmed the convictions of codefendant Anthony Thomas for the murder of Atkins and the attempted murders of Spain and Davis, and affirmed the convictions of codefendant Gerald Jeter for the murder of Atkins and the attempted murder of Spain, but vacated the defendants' sentences, remanding the matter to the trial court for resentencing. The *Jeter* court determined that the trial court erred in failing to consider defendants' rehabilitative potential as well as certain mitigating factors during the sentencing hearing. The three defendants in these two interrelated cases were sentenced in the same hearing, by the same trial court.

On November 2, 1993, the Supreme Court of Illinois entered supervisory order No. 75430 (*People v. Parson* (1993), 152 Ill. 2d 573), directing this court to enter an order vacating defendant's sentence and remanding this matter to the trial court consistent with this court's decision in *Jeter*.

■ Thus, in accordance with the supervisory order of the Supreme Court of Illinois, we hereby: (1) vacate the language in our

opinion in *Parson* pertaining to the clarification of Parson's sentence; (2) vacate Parson's sentence; and (3) remand this matter to the trial court for resentencing on Parson's murder conviction.

In modifying our opinion, we adopt the following language set forth in *Jeter*:

"Our review of the record indicates that the trial court did not carefully weigh the evidence presented at defendants' sentencing hearing, but instead, sentenced defendants 'for punishment only' based upon personal beliefs about the state of our prison system. The fact that the trial court failed to articulate the fact that it had considered the statutory factors before sentencing defendants supports this conclusion. We therefore vacate defendants' sentences and remand their cause for a new sentencing hearing in which the appropriate factors may be carefully considered." 247 Ill. App. 3d at 131-32.

For the reasons stated, defendant's sentence is vacated and this cause remanded to the trial court for the purpose of resentencing defendant.

Affirmed and remanded.

BUCKLEY and O'CONNOR, JJ., concur.